```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
D.N., individually and on behalf of G.N.,        :
                                  Plaintiff,     :
                                                 :
            -against-                            :    14 Civ. 2526 (LGS)
                                                 :
                                                 :    ORDER AND OPINION
                                                 :
THE NEW YORK CITY DEPARTMENT OF                  :
EDUCATION,                                       :
                                  Defendant.     X
------------------------------------------------------------
```

LORNA G. SCHOFIELD, District Judge:

Plaintiff D.N., individually and on behalf of her child, G.N., brings this action against the New York City Department of Education ("DOE") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* Plaintiff seeks review of the August 29, 2011, decision of the New York State Review Officer ("First SRO Decision") reversing the June 10, 2011, decision of the Impartial Hearing Officer ("IHO Decision"), which had found that the DOE had failed to provide a free and appropriate public education ("FAPE") to G.N. during the 2010-2011 school year. Plaintiff also seeks review of the December 12, 2013, decision of the New York State Review Officer ("Second SRO Decision"), again reversing the IHO Decision. The parties have cross-moved for summary judgment. Because the SRO's decision is sufficiently supported by the record, Plaintiff's motion is denied, and the DOE's motion is granted.

I.    STATUTORY FRAMEWORK

The IDEA mandates that states receiving federal special education funding provide disabled children with a FAPE. 20 U.S.C. § 1412(a)(1)(A); *M.W. ex rel S.W. v. New York City*

*Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013).  "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ("IEP") for each such child."  *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).  An IEP is a written statement that "'describes the specially designed instruction and services that will enable the child to meet' stated educational objectives and is reasonably calculated to give educational benefits to the child."  *M.W.*, 725 F.3d at 135 (quoting *R.E.*, 694 F.3d at 175); *see also* 20 U.S.C. § 1414(d)(1)(A).

New York delegates the development of an IEP to a local Committee on Special Education ("CSE").  *See* N.Y. Educ. Law § 4402(1)(b)(1) (McKinney 2014).  At a minimum, the CSE is composed of the student's parent(s), a special education teacher, a regular education teacher if the student participates in a regular education program, a school psychologist, a school district representative, an individual who can interpret the instructional implications of evaluation results, a school physician and a parent of another student with a disability.  *See* Educ. § 4402(1)(b)(1)(a).  "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program."  *R.E.*, 694 F.3d at 175.

If a parent believes that the DOE has failed to provide a FAPE to his or her child, the parent may "unilaterally place their child in a private school at their own financial risk and seek tuition reimbursement."  *M.W.*, 725 F.3d at 135 (citing *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 9-10, 16 (1993)).  To seek reimbursement, the parent must file a due process complaint with the DOE, which triggers administrative proceedings involving a hearing before an Impartial Hearing Officer ("IHO").  *See id.* (citing 20 U.S.C. §§ 1415(b)(6), (f); Educ. § 4404(1)).  The IHO hearing is governed by the three-part *Burlington/Carter* test, as construed by New York Education Law § 4404(1)(c): "(1) the DOE must establish that the student's IEP

actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them." *M.W.*, 725 F.3d at 135 (footnote and citations omitted).

The IHO's decision may be appealed to a State Review Officer ("SRO"). *See* Educ. § 4404(2); *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 225 (2d Cir. 2012) (citing *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379–80 (2d Cir. 2003)). The SRO's decision is the final administrative decision. 20 U.S.C. §1415(i)(1)(B). An aggrieved party, however, may seek review of the SRO's decision by commencing an action in federal district court. *See id.* § 1415(i)(2)(A); *M.W.*, 725 F.3d at 135-36.

## II. BACKGROUND

A thorough recitation of the facts, with which familiarity is assumed, is set forth in the First SRO Decision and this Court's Order and Opinion remanding the case to the SRO for consideration of previously unaddressed claims. *See D.N. v. New York City Dep't of Educ.*, 905 F. Supp. 2d 582, 585-86 (S.D.N.Y. 2012). The relevant facts for purposes of this Opinion are briefly stated below.

### A. G.N.'s Educational History

G.N. is a 14-year-old boy with autism spectrum disorder. As a result of his disability, G.N. exhibits severe developmental delays and is primarily non-verbal, although he has shown some signs of progress. G.N. presents with issues relating to his sensory skills and displays self-injurious behaviors, such as hitting his head with his hand and biting himself. G.N. also suffers from tantrums and shows aggressive tendencies towards others. G.N. requires the use of sensory devices, such as swings, to regulate his behavior.

Since September 2006, G.N. has attended the Rebecca School. The Rebecca School is a for-profit school that is designed specifically for children with neuro-developmental disorders, including autism. In the years preceding the 2010-2011 school year, G.N. was placed in a classroom with a 8:1:3 student-to-teacher-to-assistant ratio (one teacher and three assistants for every eight students).

**B.     G.N's Individualized Education Program for 2010-2011**

On January 12, 2010, the DOE convened a meeting of the CSE to develop G.N.'s IEP for the 2010-2011 school year. The CSE consisted of G.N.'s mother, D.N.; a district representative/special education teacher; the district school psychologist, Rose Fochetta; a social worker from the Rebecca School; a special education teacher from the Rebecca School; the parent of another child; and a family friend. In developing the IEP, the CSE considered a psychological evaluation conducted by the Rebecca School, dated December 4, 2009; a DOE-conducted classroom observation of G.N., dated October 28, 2009; and a student progress report, dated December 9, 2009. The CSE also considered input from G.N's teacher at the Rebecca School and from G.N.'s mother.

The IEP addressed G.N.'s abilities in the areas of academic performance, social and emotional performance and health and physical development. For academic performance, it provided that G.N. needed a crisis management paraprofessional; visual and verbal prompts; redirection; and the use of motivating objects. For social and emotional performance, the IEP observed that G.N. required frequent sensory breaks; use of visuals; and setting of consistent limits. For health and physical development, the IEP stated no major medical concerns, but recommended that G.N. continue occupational and physical therapy to improve low muscle tone.

To achieve these objectives, the IEP proposed that G.N. be placed in a special class in a specialized school for a twelve-month school year, with a staffing ratio of six students to one teacher and one paraprofessional (6:1:1). The IEP also proposed that G.N. be provided with a minibus with limited travel time for transportation to and from school. Additionally, the IEP recommended that G.N. receive the support of an additional full-time 1:1 crisis management paraprofessional, and various forms of therapy, including occupational therapy (five individualized thirty-minute sessions per week), speech therapy (five individualized thirty-minute sessions per week), physical therapy (three individualized thirty-minute sessions per week) and counseling (one individualized thirty-minute session per week). The CSE considered alternative classes with staffing ratios of 8:1:1, 12:1:1, and 6:1:1 without the support of an additional full-time crisis management paraprofessional, but rejected them as insufficiently supportive of G.N.'s needs.

While the IEP did not include a Functional Behavioral Assessment ("FBA"),[1] it did include a Behavioral Intervention Plan ("BIP")[2] listing G.N.'s behaviors that interfere with learning, and suggesting strategies to correct them. The BIP observed that G.N. exhibits self-injurious behaviors, has a limited awareness of safety, may be aggressive towards others, may have a tantrum two to three times per week and exhibits attention seeking and sensory seeking

---

[1] An FBA is "the process of determining why the student engages in behaviors that impede learning and how the student's behavior relates to the environment," N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(r), which "shall include, but is not limited to, the identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior (including cognitive and affective factors) and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it." *Id.*

[2] A BIP is "a plan that is based on the results of [an FBA] and, at a minimum, includes a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs and intervention strategies that include positive behavioral supports and services to address the behavior." N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(mmm).

behaviors.  The BIP listed several objectives, including "[e]limination of self injurious behaviors and aggression toward others," "decrease tantrums," "[r]educe attention seeking behaviors for greater independence" and "increase [student's] ability to self-regulate."  In order to counteract these behaviors, the BIP recommended a sensory diet and sensory input, use of a "communication book," movement breaks and deep pressure and joint compression.

### C. Rejection of the Recommended School Placement

The IEP did not include a recommended school placement for G.N.  Instead, the DOE issued a Notice of Deferred Placement to Plaintiff, indicating that a placement would be provided in time for the start of the school year in July 2010.  By letter dated June 15, 2010, the DOE notified Plaintiff that G.N. would be offered a placement at PS94, at the Children's Workshop School Location, a specialized District 75 public school in Manhattan.  On June 16, 2010, the parent wrote the DOE, contending that the DOE committed both procedural and substantive errors in developing G.N.'s IEP, depriving him of a FAPE for the 2010-2011 school year.  The letter informed the DOE that the parent intended to re-enroll G.N. at the Rebecca School and seek reimbursement.

On June 17, 2010, the parent sent a letter to the DOE requesting additional information about PS94 and a tour of the facilities.  After the parent visited PS94, accompanied by a Rebecca School social worker, the parent signed a contract enrolling G.N. at the Rebecca School for the 2010-2011 school year.  On August 16, 2010, the parent sent a letter to the DOE confirming G.N.'s enrollment in Rebecca.

### D.     Procedural History

#### i.     Due Process Complaint and IHO Decision

On September 13, 2010, the parent filed a due process complaint and requested an impartial hearing, alleging, *inter alia*, that: (1) the DOE refused to consider placing the student in a non-public school; (2) the CSE was improperly constituted; (3) the IEP was based on insufficient information; (4) the IEP contained inadequate goals; (5) the CSE failed to conduct an FBA; (6) the IEP did not include a transition plan for the change from a private school to a public school; (7) the parent was denied an opportunity to participate meaningfully in the development of the IEP; (8) the IEP failed to recommend sufficient related services or to address the student's sensory needs; (9) the CSE predetermined its program recommendation and failed to take into account the parent's views; (10) the assigned school, PS94, would have been inappropriate for the student; (11) the IEP did not provide for parent counseling; and (12) the IEP did not provide for transportation services.

An IHO conducted a hearing over seven non-consecutive days between November 9, 2010, and April 28, 2011.  In a decision issued on June 10, 2011, the IHO found that the DOE had failed to offer G.N. a FAPE for the 2010-2011 school year.  The IHO reached this conclusion on the basis of three of the grounds identified in the due process complaint, without addressing the remaining grounds.  First, addressing grounds 7 and 9 above, the IHO found that the parent was denied a meaningful opportunity to participate in the CSE meeting because the meeting took place with the "expressed intent of placing the child in a 6:1:1 placement," and thus did not give due consideration to the parent.  Second, addressing ground 10 above, the IHO found that the proposed placement was "fatal[ly] flaw[ed]" due to a lack of swings and other sensory equipment.  After finding the Rebecca School to be an appropriate placement and

7

determining that the equities favored the parent, the IHO ordered the DOE to reimburse the parent.

### ii. The First SRO Appeal and Determination

On July 13, 2011, the DOE appealed the IHO's decision to the SRO. Plaintiff did not cross-appeal. On August 29, 2011, the SRO issued a twenty-page opinion reversing the decision of the IHO. The SRO found that the hearing record did not support the parent's claim that the CSE predetermined G.N.'s placement and failed to take into account the parent's views; rather, the evidence demonstrated "meaningful and active parental participation in the development of the student's January 2010 IEP and a willingness among the CSE members to consider different program options for the student." The SRO also found that PS94 was capable of addressing G.N.'s sensory needs, but added that the parent's claim was "in large part speculative based upon the events in this case," since the student had never attended the assigned school.

The SRO declined to rule on the remaining claims raised in the due process complaint because they were unaddressed by the IHO and were not cross-appealed by the parent. The SRO considered, but did not base his ruling on, two additional claims -- whether the student's sensory needs were adequately addressed by the IEP (as opposed to the assigned school) and whether the placement at PS94 was appropriate, finding that the DOE did not deny G.N. a FAPE on either ground.

### iii. First Federal District Court Action and Remand to SRO

On December 16, 2011, Plaintiff initiated an action in federal court, seeking reversal of the First SRO Decision, and raising many of the claims left unaddressed by the IHO and SRO. On December 10, 2012, without addressing the merits of any of Plaintiff's claims, the Court

remanded the case to the SRO to consider the unaddressed claims. *See D.N.*, 905 F. Supp. 2d 582.

### iv.     The Second SRO Decision

On December 12, 2013, the SRO issued the Second SRO Decision, reiterating the determinations in the First SRO Decision and concluding that none of the parent's additional claims constituted grounds on which a FAPE was denied to G.N.

The SRO concluded that (1) the district was not required to consider placing the student in a non-public school if it believed that a public school would adequately address the student's needs; (2) the CSE was properly constituted; (3) the CSE reviewed a sufficient amount of information in developing the IEP, including classroom observation, a psychological report, an interdisciplinary report of progress and a previous IEP; (4) the annual goals set forth in the IEP were "sufficiently specific and measurable to guide instruction"; (5) an FBA was unnecessary because G.N's behavioral triggers were already known at the time the CSE was convened and because the BIP adequately addressed G.N.'s behavioral issues; (6) the IEP was highly structured and adequately provided for G.N.'s transitional needs; (7) the IEP's lack of provision for parent counseling and training, while in violation of applicable regulations, did not amount to a FAPE denial; and (8) a 6:1:1[3] class with a 1:1 paraprofessional was reasonably calculated to provide adequate support.[4]

---

[3] Although not asserted in the due process complaint, the SRO addressed the class ratio claim, which was raised by the parent in the proceedings before the SRO. While an issue not raised in the due process complaint typically falls outside the scope of this Court's review, *R.E.*, 694 F.3d at 187 n.4, the DOE has not raised this defense and because it is not outcome-determinative, the claim is addressed here.

[4] The SRO did not specifically address the claim challenging the IEP's lack of transportation services -- ground 12 of the due process complaint listed above.

Finding that the IHO's determination that the DOE failed to offer G.N. a FAPE was not supported by the record, the SRO did not consider prongs two and three of the *Burlington/Carter* test.

## III. STANDARD

A motion for summary judgment in the IDEA context is "in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (citations and internal quotation marks omitted); *accord M.W.*, 725 F.3d at 138 ("Summary judgment in the IDEA context . . . is only a pragmatic procedural mechanism for reviewing administrative decisions.") (citation and internal quotation marks omitted). The task of a district court reviewing an SRO decision is to determine whether the SRO's decision is supported by "the preponderance of the evidence, taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." *Grim*, 346 F.3d at 380 (citation and internal quotation marks omitted). In evaluating the sufficiency of an IEP, neither the administrative officers nor the courts may rely on "retrospective testimony that the school district would have provided additional services beyond those listed in the IEP." *R.E.*, 694 F.3d at 186.

A district court "must give due weight to [the administrative] proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam) (alterations in original) (citation and internal quotation marks omitted). Accordingly, a federal court may not "substitute [its] own notions of sound educational policy for those of the school authorities." *M.W.*, 725 F.3d at 139 (citation and internal quotation marks omitted). "[D]eterminations regarding the substantive

10

adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *M.H.*, 685 F.3d at 244.

Where the IHO and the SRO reach conflicting decisions, federal courts "must defer to the reasoned conclusions of the SRO as the final state administrative determination." *Id.* at 246; *accord R.E.*, 694 F.3d at 189. "The deference owed depends on both the quality of the opinion and the court's institutional competence." *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014) (footnote omitted) (citing *M.H.*, 685 F.3d at 244). A reviewing court may take into account "whether the decision being reviewed is well reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *R.E.*, 694 F.3d at 189 (citation and internal quotation marks omitted).

To determine whether an IEP complies with the IDEA, "courts make a two-part inquiry that is, first, procedural, and second, substantive." *Id.* at 189-90. The procedural inquiry requires courts to examine "whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA." *Id.* at 190 (citation and internal quotation marks omitted). Procedural violations warrant reimbursement only where the violations individually or cumulatively "'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'" *Id.* (alteration in original) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).

The substantive inquiry requires courts to "examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefit[s]." *Id.* (alteration in original) (citation and internal quotation marks omitted). The IDEA does not "guarantee any particular level of education," or "require that a child be provided

11

with the optimal programmatic alternative." *C.F. ex rel. R.F.*, 746 F.3d at 72 (citations and internal quotation marks omitted). Instead, it requires "selection of a program that provides a 'basic floor of opportunity,'" and that is "'likely to produce progress, not regression.'" *Id.* (citation omitted). Unlike procedural inadequacy, "[s]ubstantive inadequacy automatically entitles the parents to reimbursement." *R.E.*, 694 F.3d at 190.

## IV. DISCUSSION

Plaintiff has not shown that the SRO's decisions are not entitled to deference. Both decisions reflect a thorough review of the record and well-reasoned determinations. Because "[c]ourts generally 'defer to the final decision of the state authorities'" if the decision is "thorough and careful," *M.H.*, 685 F.3d at 241 (citations omitted), and because the SRO's findings are supported by a preponderance of the evidence, the SRO's decisions are entitled to deference. Because the first prong of the *Burlington/Carter* test is satisfied, the second and third prongs of the test are not considered.

### A. Claims Beyond the Scope of Review

Plaintiff asserts a number of claims pertaining to the appropriateness of the placement at PS94 that are beyond the scope of a district court's review. Such claims include: (1) PS94 was inappropriate because it would not have provided sufficient sensory equipment to meet G.N.'s needs[5]; (2) the DOE could not have implemented the IEP at the assigned school site; and (3) the

---

[5] To the extent Plaintiff challenges the adequacy of the IEP in meeting G.N.'s sensory needs, that claim fails because, as the SRO correctly found, the IEP addressed G.N.'s "sensory needs and recommended related services, program modifications, and behavior strategies designed to address those needs." Both the IEP and the BIP included extensive recommendations for sensory-based regulation methods, such as sensory breaks, sensory "snacks," and the use of a communication book. Accordingly, to the extent challenged, the SRO's decision is affirmed on this ground.

DOE failed to ensure that G.N. would be placed in a classroom at the assigned school site with students of similar abilities.[6]

Where a child never actually attends the assigned school site, "[t]he appropriate inquiry is into the nature of the program actually offered in the written plan, not a retrospective assessment of how that plan would have been executed [at the assigned school]." *K.L. ex rel. M.L. v. New York City Dep't of Educ.*, 530 F. App'x 81, 87 (2d Cir. 2013) (first alteration in original) (internal quotation marks omitted) (citing *R.E.*, 694 F.3d at 187). Accordingly, a parent may not rely on "[s]peculation that the school district will not adequately adhere to the IEP" in seeking tuition reimbursement for the unilateral placement of the student. *R.E.*, 694 F.3d at 195. Because G.N. never attended PS94, Plaintiff's claims challenging the adequacy of PS94 are beyond the scope of permissible review and are dismissed.

### B. Procedural Claims

Plaintiff alleges four procedural violations: (1) the DOE predetermined its recommendation to place G.N. in a class with a 6:1:1 ratio without allowing for parental input; (2) the IEP failed to provide for parent training and counseling; (3) the IEP did not provide G.N. with a school to attend for the entire 2010-2011 school year; and (4) the CSE failed to conduct an FBA. The SRO's decision rejecting each of these claims is upheld.

#### i. Predetermined Recommendation

Plaintiff contends that the CSE predetermined its recommendation with respect to both the appropriate school and the appropriate class size for G.N., and failed to take into account the parent's views when assessing G.N.'s options. The SRO rejected these claims, finding that the record demonstrated that the parent actively participated in the CSE meeting and the CSE was

---

[6] The due process complaint did not explicitly raise this claim, but reserved the right to raise the claim at a later time, and was briefed by the parent in proceedings before the SRO.

receptive to input.  In particular, the SRO observed that aspects of the IEP, such as certain goals, were modified on the basis of the parent's input, and that the CSE's discussion of various programs for G.N. -- evidencing a lack of any predetermined decision -- was reflected in the IEP itself, which stated that a "special class in a specialized school with student to teacher ratios of 12:1:1 and 8:1:1 were considered and rejected as insufficiently supportive."

A predetermination claim amounts to a challenge to the parent's opportunity to participate; where the record reflects that a school district maintained an "open mind" to the parent's views and the parent has been afforded an opportunity to participate meaningfully in the development of the student's IEP, a predetermination claim fails.  *See T.P.*, 554 F.3d at 253 (rejecting predetermination claim where the record reflected meaningful participation by the parents and the parents "failed to show that [the district] did not have an open mind as to the content of [the student's] IEP"); *M.H.*, 685 F.3d at 256-57 (no predetermination where the evidence did not "tend to establish that the district would not consider a[n] [alternative] placement in an appropriate case").

Here, the record reflects both that the parent actively contributed to the development of the student's IEP and that the CSE considered the parent's input and modified the IEP in response to that input.  For example, the record shows that the parent expressed concerns that G.N. required a 12-month program with greater support than a 6:1:1 staffing ratio.  In response, the CSE included in the IEP a recommendation for a 12-month program in a 6:1:1 class with the extra support of a 1:1 paraprofessional.  In addition, testimony from the parent and the school psychologist shows that the views of the parent were expressly solicited in reviewing G.N.'s goal development, and that the CSE adjusted certain goals downward in response to the parent's concerns.  The CSE meeting minutes memorialize that the parent was "asked explicitly" if she

was in agreement with the goals developed, and that she answered "yes." The minutes also show that the parent was "asked explicitly" whether she had anything to add to the IEP, to which she answered "no." Because the record indicates both active participation by the parent and a willingness on the CSE's part to modify G.N.'s IEP on the basis of the parent's input, the SRO's determination is upheld.

Plaintiff contends that her predetermination claim pertains to both the 6:1:1 program and the actual PS94 placement, and that the SRO erred because his "entire predetermination analysis goes only to the 6:1:1 program, not the PS94 school placement." But the record reflects that the CSE did not discuss a specific school placement for G.N., and Plaintiff identifies no evidence that PS94 was preselected for the 2010-2011 school year, apart from an allegation that the DOE had assigned G.N. to the same school for the 2009-2010 school year. The allegation is not borne out by the evidence, however, which reflects that for the 2009-2010 school year, the DOE recommended a placement at PS94, but at the P188 location -- a different location than that recommended for the 2010-2011 school year, at the Children's Workshop location. In any case, the DOE is entitled to "select the specific school without the advice of the parents so long as it conforms to the program offered in the IEP." *R.E.*, 694 F.3d at 191-92. Accordingly, the SRO's determination is upheld.

### ii. Failure to Include Parental Training

The SRO correctly found that the IEP's failure to include parent counseling and training did not on its own result in the denial of a FAPE. In reaching this determination, the SRO relied on *R.E. v. New York City Department of Education*, where the Second Circuit reasoned that "[t]hough the failure to include parent counseling in the IEP may, in some cases (particularly when aggregated with other violations), result in a denial of a FAPE, in the ordinary case that

failure, standing alone, is not sufficient to warrant reimbursement." 694 F.3d at 191. Because the parent identified no specific circumstances that rendered the lack of parent counseling particularly egregious, the SRO concluded that while the lack of parent counseling and training was a violation of the applicable regulations, it did not amount to a FAPE denial.

State regulations require that an IEP include parent counseling and training when appropriate. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2)(v)(b)(5) ("The IEP shall indicate . . . the extent to which the student's parents will receive parent counseling and training . . . when appropriate."). Failure to provide for parent counseling may constitute a procedural violation, but "ordinarily does not result in a FAPE denial or warrant tuition reimbursement." *M.W.*, 725 F.3d at 142; *accord T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 170 (2d Cir. 2014) (holding that "parent counseling and training as part of [the student's] ESY program was not a sufficiently serious procedural violation to deny [the student] a FAPE"). Here, while the failure to provide for parent counseling and training plainly constituted a procedural violation, it did not, in the absence of other deficiencies in the IEP, amount to a FAPE denial. Accordingly, the SRO's finding is upheld.

        iii.    **Failure to Provide a Timely Placement and Failure to Offer a Summer Placement**

Plaintiff argues that G.N. was denied a FAPE because the district failed to offer G.N. a placement in time for the beginning of the 2010-2011 school year and also failed to offer G.N. any placement for the summer of 2010. Because the record establishes that the parent timely received the IEP, and a preponderance of the evidence supports the SRO's conclusion that the DOE offered G.N. a placement for the full twelve-month academic year, the SRO's determination is upheld.

Under federal and state regulations, an IEP must be in effect for the student at the beginning of the school year. 34 C.F.R. § 300.323(a); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(e)(l)(ii). As long as the parents are provided with the IEP before the first day of school, the district has fulfilled its legal obligation under the statute. *See Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 193-94 (2d Cir. 2005) ("Although the [parents] might have preferred to receive the IEP sooner, and we are sympathetic to the frustration they undoubtedly felt in not receiving it sooner despite repeated requests, the District fulfilled its legal obligations by providing the IEP before the first day of school."); *see also B.P. v. New York City Dep't of Educ.*, 841 F. Supp. 2d 605, 614 (E.D.N.Y. 2012) (same).

Here, the IEP provided for a twelve-month placement and program and was received by the parent prior to the beginning of the school year, in satisfaction of the DOE's obligations under both federal and state law. While Plaintiff claims that G.N. was not provided a school to attend at the beginning of the school year, the claim is not supported by the record. Specifically, Plaintiff alleges that when she visited PS94, she was told that PS94 was closed in the summer and the students would be moved elsewhere. However, the parent's testimony was equivocal -- she stated that she thought she was told PS94 would be closed, but the person who spoke with her was "talking very fast." Apart from this testimony, nothing in the record suggests that PS94 was to be closed for the summer; in fact, a teacher at PS94, Ms. Patilano, testified that during the 2010 summer, she taught the very 6:1:1 class in which G.N. would likely have been placed. Finally, even if the parent were told that PS94 would be closed for the summer, she also stated that she was told that the students would be moved to a different school, and the DOE is not required to provide a student with a single school for the entire year, as long as the student is provided a structured program for the entire school year. *See Bettinger v. New York City Bd. of*

*Educ.*, No. 06 CV 6889, 2007 WL 4208560, at *9 (S.D.N.Y. Nov. 20 2007) ("The IEP's 12-month recommendation does not require that [the student] be enrolled in a single program for an entire year, but rather, that he attend a structured program for a full 12 months.").

        iv.        **Failure to Provide an FBA and Inadequate BIP**

Plaintiff alleges that the CSE failed to perform an FBA before developing G.N.'s BIP, rendering the BIP deficient. The SRO determined that the failure to perform an FBA did not impair the CSE's ability to develop an appropriate BIP, relying on testimony of the district school psychologist that G.N.'s behaviors were well-documented in the BIP and throughout the IEP, both of which contained detailed methods for addressing the student's behavioral issues. The SRO's determination is supported by a preponderance of the evidence and accordingly merits deference.

The failure to conduct an FBA does not render an IEP legally inadequate so long as the school district "'consider[s] the use of positive behavior interventions and supports, and other strategies' when a child's behavior impedes learning." *M.W.*, 725 F.3d at 140 (citation omitted); *R.E.*, 694 F.3d at 190 ("[W]hen an FBA is not conducted, the court must take particular care to ensure that the IEP adequately addresses the child's problem behaviors."). Where, as here, "the IEP actually includes a BIP, parents should at least suggest how the lack of an FBA resulted in the BIP's inadequacy or prevented meaningful decision-making." *M.W.*, 725 F.3d at 140.

Here, the record fully supports the SRO's finding that the failure to conduct an FBA did not result in a deficient BIP. The record reflects that in devising the BIP, the CSE considered numerous behavioral reports, including a progress report conducted by G.N.'s teacher at the Rebecca School, and the district school psychologist testified that the CSE "had a solid understanding" of G.N.'s behaviors. The resulting BIP both identifies G.N.'s behavioral

18

challenges and suggests detailed methods to address those challenges. Specifically, the BIP records that G.N.'s interfering behaviors include self-injurious behaviors, a limited awareness of safety, aggression towards others, having tantrums two to three times per week and exhibiting attention and sensory-seeking behaviors. To address these behaviors, the BIP recommends regulation through sensory input, such as brushing and swinging; the use of a communication book, sensory integration, and a greater awareness of feelings to increase self-regulation; movement breaks such as walking and gross motor activities; a crisis management paraprofessional; speech, occupational, and physical therapy; the use of a counselor; and an overall increase in sensory supports. The district school psychologist testified that no one at the CSE meeting objected to the BIP, including the student's parent, and that the BIP was revised based on input from the parent and G.N.'s teacher from the Rebecca School.

Because the record substantially supports the SRO's determination that the lack of an FBA did not result in an inadequate BIP, the SRO's decision on this ground is upheld.

### C.     Substantive Claims

Plaintiff alleges that the assignment of a 1:1 crisis-management paraprofessional did not provide the type and intensity of support required by G.N. The SRO determined that the CSE appropriately recommended that G.N. be placed in a 6:1:1 class with a 1:1 paraprofessional, and that this recommendation was reasonably calculated to allow G.N. to receive educational benefits. In reaching this conclusion, the SRO primarily relied on the district psychologist's testimony that G.N. required "significant adult support throughout the school day," and that the 1:1 crisis paraprofessional, along with other recommendations set forth in the IEP, satisfied G.N.'s need for support. The SRO also observed that the district school psychologist testified

that no one at the CSE meeting had objected to the inclusion of a 1:1 paraprofessional in G.N.'s IEP.

The "adequacy of 1:1 paraprofessional support as opposed to 1:1 teacher support is precisely the kind of educational policy judgment to which [courts] owe the state deference if it supported by sufficient evidence." *R.E.*, 694 F.3d at 192. Determinations relating to "[c]lass size and student-teacher ratios involve questions of methodology more appropriately answered by the state and district decision-makers than by federal judges." *M.L. v. New York City Dep't of Educ.*, No. 1:13 Civ. 00574, 2014 WL 1301957, at *11 (S.D.N.Y. March 31, 2014) (quoting *D.J. v. New York City Dep't of Educ.*, 12 Civ. 7009, 2013 WL 4400689, at *5 (S.D.N.Y. Aug. 15, 2013)). Here, the SRO's conclusion was amply supported by the record, including extensive testimony by the district school psychologist, and is accordingly entitled to deference.

## V.   CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED and Defendant's cross-motion for summary judgment is GRANTED. The Clerk of Court is directed to close the motions at Docket Nos. 14 and 22, and to close the case.

SO ORDERED.

Dated: March 3, 2015
      New York, New York

_____
LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE